**VALOR OIL COMPANY et al., Appellants,**

v.

**John J. EISNER et al., Appellees.**

No. 11337.

Court of Civil Appeals of Texas.

Austin.

Nov. 10, 1965.

Rehearing Denied Dec. 1, 1965.

Golden, Croley, Howell, Johnson & Mizell, Robert S Mizell, Fred Lohmeyer, Dallas, for appellants.

Rutledge & Rutledge, W. J. Rutledge, Jr., Abilene, for appellees.

PHILLIPS, Justice.

This is a suit in which the appellees, plaintiffs below, seek to cancel a certain assignment of production payment in the amount of $65,000 to appellant, Valor Oil Company, and a certain deed of trust executed by said appellant granting to appellant Republic National Bank of Dallas a lien upon the production payment.

The trial court granted judgment in favor of appellees cancelling all of the hereinafter described conveyances and appellants Valor Oil Company and Republic Na-

tional Bank of Dallas have perfected their appeal to this Court.

We reverse the judgment of the trial court and render judgment that the hereinafter described production payment and deed of trust lien are valid and outstanding.

Appellees, on and prior to December 19, 1961, were the owners of the full seven-eighths (⅞) working interest (subject to certain overriding royalties not pertinent here) under seven oil and gas leases designated as the "Knight A Lease" through "Knight G Lease," and the appellees have alleged that on December 19, 1961, the defendant C. T. Robertson made a proposal in writing to them wherein he would institute a waterflooding project on the properties. That in return for an assignment of a portion of the oil and gas recovered, Robertson would install the waterflood project without cost to any of the appellees. This agreement is referred to as the letter of December 19, 1961. The proposal was thereafter accepted by all of such owners. In this regard, a witness and attorney, Jack Bryant, testified that he was representing the appellee, John J. Eisner, in the Fall of 1961 and prepared the December 19, 1961 proposal. Thereafter, he continued to represent Mr. Eisner as an attorney, but about the first of April, 1962, he and Mr. Eisner agreed that if he did anything further in connection with this particular transaction, it should be charged to Mr. Robertson.

On or about the 1st day of May, 1962, Mr. Robertson requested Bryant to assist him in the preparation of the Unit Agreement in connection with these properties as he (Robertson) desired financing from the Republic National Bank of Dallas. At Mr. Robertson's request, Bryant called Robert S. Mizell, an attorney for Republic National Bank of Dallas, and as a result of that conversation drafted the language which was subsequently incorporated as Article III of the Unit Agreement. He then prepared the Unit Agreement dated June 10, 1962, had it mimeographed on June 12th,

1962, and delivered the mimeographed copies to the interested parties.

Article III of the Unit Agreement reads as follows:

### "OPERATOR'S RIGHTS

1. Each of the undersigned NON-OPERATING INTEREST OWNERS, by the execution hereof, grants, transfers and assigns to OPERATOR, subject to the reservation of interest and the provisions regarding the terminating of OPERATOR'S Interest and reversion thereof hereinafter set out, the interest of such NON-OPERATING INTEREST OWNERS in the oil and gas lease and leasehold estate described in Exhibit 'A', same being subject to such interests' proportionate part of all overriding royalties now appearing of record, provided, however:

(a) There is reserved to the undersigned NON-OPERATING INTEREST OWNERS, as an overriding interest, an undivided 47.5% of all the unitized substances produced, saved and sold from the interests in such lease owned by the undersigned NON-OPERATING INTEREST OWNERS, which portion of said unitized substances shall be obtained, used and marketed by the OPERATOR without cost or expense to the NON-OPERATING INTEREST OWNERS save and except gross production and ad valorem taxes, which portion of such unitized substances the NON-OPERATING INTEREST OWNERS shall have the right to receive in kind if desired.

(b) In the event OPERATOR should cease to operate such lease for any reason the interests herein transferred to OPERATOR shall ipso facto terminate and shall immediately revert to and revest in the undersigned NON-OPERATING INTEREST OWNERS

and their heirs, successors and assigns."

Appellees contend, in support of the trial court's judgment, that the letter agreement of December 19, 1961 and the Unit Agreement were executory contracts that must be construed together. That the two instruments construed together comprise a simple contract under which no conveyance of title was intended and that upon a showing that the contract had not been performed by Robertson, appellees were entitled to its termination in accordance with the judgment of the trial court. That no lien attached in favor of the appellants herein. Appellees cite the following provisions of the Unit Agreement in support of this position:

*"Article III, Section 4:*

Operator shall, at his own cost and expense, and without any expense to any of the other parties hereto, install and operate such equipment, machinery and other items necessary to waterflood the unitized zone under the unit area in keeping with certain contracts dated December 19, 1961, between OPERATOR and NON-OPERATING INTEREST OWNERS.

OPERATOR agrees to carry out his operations on the unit area in a good and workmanlike manner and in conformity with accepted oil field practices.

In addition to the initiation of the waterflooding project at his sole cost and expense, OPERATOR will also operate the unit area at his sole cost and expense, and without expense to the other parties hereto."

*"Article III, Section 1 (b):*

In the event OPERATOR should cease to operate such lease for any reason the interests herein transferred to OPERATOR shall ipso facto terminate and shall immediately revert to and revest in the undersigned NON-OPER-

ATING INTEREST OWNERS and their heirs, successors and assigns."

*"Article VIII, Section 1:*

All of the terms and provisions of this agreement shall extend to and shall be binding upon and inure to the benefit of the respective heirs, devisees, legal representatives, successors and assigns, of the parties hereto, and shall constitute a covenant running with the land, lease and interests covered hereby."

*"Article VIII, Section 2:*

Any transfer, assignment or conveyance of all or any part of any interest owned by any party hereto with respect to any tract shall be made expressly subject to the terms of this agreement."

Appellants are before us on three points of error however as we sustain their first point we shall not discuss the remaining two.

Appellants' first point of error is that of the trial court in granting judgment in favor of the appellees cancelling the production payment assigned to the appellant Valor Oil Company and the deed of trust and assignment and runs in favor of the appellant Republic National Bank of Dallas for the reason that under the unambiguous terms of the Unit Agreement, the leasehold interest of appellees in the properties, subject to the reservation of overriding royalty, was conveyed to the defendant C. T. Robertson; such unit agreement contained no condition of defeasance which would be applicable in the case at hand; and accordingly, neither the conveyance to Robertson, the assignment of the production payment to the appellant Valor Oil Company, nor the deed of trust and assignment of runs in favor of the Republic National Bank of Dallas can be cancelled.

It should be pointed out that in his findings of fact and conclusions of law the trial court found that C. T. Robertson took

possession of the lands described in the leasehold in pursuance of "such written proposal;" and continued his possession thereof until the Receiver in this cause was appointed, purportedly pursuant to the terms and provisions of the Unit Agreement and such proposal; and that all of the acts of the said Robertson pertinent to said properties were done by him in the purported performance of the contracts evidenced thereby. Consequently, there is no question in this case of any reversion because of any nonperformance on the part of Robertson. There is a question as to the quality of Robertson's performance with respect to the waterflooding project and if Robertson failed to perform as agreed, appellees' remedy lies in damages.

There is no language in the Unit Agreement indicating an intention that it was solely to implement the December 19, 1961 letter and the references to this letter are only for certain limited purposes. These references appear as follows:

The first sentence in Article III, paragraph 4, reads as follows:

"OPERATOR shall, at his own cost and expense, and without expense to any of the other parties hereto install and operate such equipment, machinery and other items necessary to waterflood the unitized zone under the unit area in keeping with certain contracts dated December 19, 1961, between OPERATOR and NON-OPERATING INTEREST OWNERS."

Article V, paragraph 2, reads as follows:

"OPERATOR shall obtain and pay for all other personal property and equipment necessary to carry out the operation, including waterflooding, of the unit area and all such property and equipment obtained by OPERATOR shall at all times remain the property of the OPERATOR, subject only to certain rights of NON-OPERATING INTEREST OWNERS to acquire title to such property under the terms of certain agreements between the NON-OPERATING INTEREST OWNERS and OPERATOR dated December 19, 1961."

Thereafter, by an instrument dated July 13, 1962, designated "Assignment of Production Payment," the defendant C. T. Robertson conveyed to Valor Oil Company eighty per cent (80%) of his net interest (being the interest conveyed to him by the Unit Agreement less the overriding royalty interest reserved by the appellees) until Valor Oil Company received the full net sum of $65,000.00, plus an additional amount equal to seven per cent (7%) per annum on the declining balances of such amount computed monthly.

Contemporaneously with the execution and delivery of that assignment, appellant Valor Oil Company executed its deed of trust and assignment of runs to a trustee, to secure appellant Republic National Bank of Dallas in the payment of a $65,000.00 promissory note. For the execution and delivery of such assignment, the defendant C. T. Robertson was paid the sum of $65,-000.00 by the deposit of such amount in his account and none of such funds were used to apply on indebtedness, if any, owing by C. T. Robertson to such Bank.

Even under the appellees' pleadings, evidence, briefs and motions, C. T. Robertson had until some time in November, 1962, to complete the proposed waterflood and there is no evidence that he was in default or that any of the appellees claimed that he was in default at the time of these transactions with appellant Valor Oil Company. As a matter of fact, it is undisputed that defendant C. T. Robertson did drill a water well, convert three injection wells, install pressure pumps, lay lines and do other things in pursuance of the waterflood project.

■ Under the foregoing facts and circumstances, the rights of these appellants became fixed upon the execution and delivery of the assignment of production payment and of the deed of trust and assignment of runs and such rights were and are not subject to defeasance irrespective of what may have subsequently transpired.

■ The appellees have taken the position that the December 19, 1961 letter is the basic instrument between C. T. Robertson and themselves, and that the Unit Agreement merely implements the letter. The converse is true, because, in addition to the words of conveyance contained in the Unit Agreement (and not appearing in the letter) we have the following additional factors:

The Unit Agreement executed by the same parties subsequent to the letter agreement refers to the letter agreement solely for certain limited purposes as quoted above in Article III, 4 and Article V, 2.

Contrary to the allegations of the appellees that C. T. Robertson had the option to operate the project for a period of two years under both the letter and the Unit Agreement, the letter in the fifth paragraph refers to a two-year period and the Unit Agreement in Article XIII refers to a three-year period.

The letter makes absolutely no reference by implication or otherwise to the subsequent execution of a Unit Agreement or other instrument.

The Unit Agreement was executed subsequent to the letter, is a formal document, and was acknowledged by all of the parties before Notaries Public.

It is, therefore, necessary to examine the operative portions of the Unit Agreement to determine its effect.

Article III, 1(a) constitutes a conveyance from appellees to C. T. Robertson and a reservation by the appellees of an overriding royalty of 47.5%. The effect of this language as a conveyance is recognized in the introductory portion of Article IV, 2, reading:

"Except as provided in Article III, Section 1, with reference to the assignment of a portion of the oil and gas lease and leasehold estate to Operator * * *."

Further language in the Unit Agreement referring to the conveyance is as follows:

In the event Robertson ceased to operate the properties the *interests herein transferred* ipso facto terminate and revert to the appellees.

Article III, 1(b). When production and operations cease for more than thirty (30) consecutive days or if Robertson at the end of three years from the date of commencement of water injection determines that unitized substances can no longer be produced in paying quantities.

Article III, 4, sets forth the obligations of Robertson, as follows:

"4. OPERATOR shall, at his own cost and expense, and without expense to any of the other parties hereto install and operate such equipment, machinery and other items necessary *to waterflood the unitized zone under the unit area* in keeping with certain contracts dated December 19, 1961, between OPERATOR and NON-OPERATING INTEREST OWNERS. The plan and method of such waterflooding operations shall be at the discretion of OPERATOR, and OPERATOR shall be under no liability to the other parties hereto as to any action in good faith taken or omitted to be taken by him in connection therewith, however, OPERATOR agrees to carry out his operations on the unit area in a good and workmanlike manner and in conform-

ity with accepted oil field practices. In addition to the initiation of the water-flooding project at his sole cost and expense, OPERATOR will also operate the unit area at his sole cost and expense, and without expense to the other parties hereto." (Italics added.)

Other provisions in the agreement relate to the respective rights of the parties as to personal property, unitization of the production from the various leases, allocation of the unitized production, taxes, transfers and assignments, limitations of liability, laws and regulations, force majeure and formal provisions.

Under the plain and unequivocal language of the Unit Agreement there was a *conveyance* to the defendant C. T. Robertson, together with certain collateral covenants on his part regarding waterflood operations. Undertakings such as those of Robertson's have been repeatedly held to be covenants, for the breach of which the remedy is damages, even as between the parties to the conveyance. The Supreme Court passed on the question in Chicago, T. & M. C. Ry. Co. v. Titterington et ux., 84 Tex. 218, 19 S.W. 472 (1892). In that case the plaintiffs, Titterington et ux., sought to cancel a right-of-way deed which they had previously executed to the railroad. That right-of-way deed expressly stated the consideration in the following language:

" 'That, for and in consideration of the enhanced value to be given and is contemplated to arise to our lands and other property by the location and construction of the Chicago, Texas & Mexican Central Railway Company, and for the consideration of full and complete value accruing to us by this transaction, in locating and maintaining a station on the lands hereby granted,' * * *."

The station referred to was not constructed. The trial court granted the Titteringtons the relief requested, but the Supreme Court reversed and remanded the case, stating:

"We are of the opinion that the deed is in no sense executory, but that it passed the title to the land entirely out of the grantors, and to the railway company. The appellees neglected to reserve any title in themselves, or to provide for the reversion of the estate in the event that the contract should be broken by the grantee."

And further that:

" * * * in case of doubtful language or intention, the promise or obligation of the grantee will be construed to be a covenant limiting the grantor to an action thereon, and not a condition subsequent, with the right to defeat the conveyance. Under the authorities, we think that it must be held, and we do hold, that the promises or obligations of the railway company referred to in the deed are in the nature of covenants, not conditions, and therefore the plaintiffs, aside from the other questions in the case, could not reclaim the land itself on account of the nonperformance of the covenants or promises by the grantee, but would be required to sue for the damages arising from the breach of the contract."

To the same effect are a long line of cases concerning deeds and grants in consideration of the grantee's agreement to maintain and support the grantor, and to perform other agreements in connection with the premises conveyed. A recent example of these cases is Hearne v. Bradshaw, 158 Tex. 453, 312 S.W.2d 948 (1958). In that case Mrs. Hearne conveyed a house and lot to the Bradshaws. The deed contained the following recitation, to wit:

" 'Ten ($10.00) Dollars * * * Dollars to me, and in hand paid by Jasper Bradshaw and his wife Mattie Bradshaw, and the further consideration to

take the said property and maintain the same, pay all taxes and insurance and furnish me with food and clothing the rest of my natural life, and I do by this instrument reserve the right to live in said property as long as I live. It being the intention of this instrument to deed said property to the said grantees but reserve a life interest in the property in me the said grantor.' "

Mrs. Hearne alleged that the consideration for the deed had failed in that the Bradshaws had refused to perform the obligations imposed upon them by the terms of the deed. The Supreme Court held that Mrs. Hearne was not entitled to rescission even though the covenants constituting the consideration for the deed had not been performed. The Court said:

"Conditions subsequent are not favored by the courts, and the promise or obligation of the grantee will be construed as a covenant unless an intention to create a conditional estate is clearly and unequivocally revealed by the language of the instrument. In cases where the intention is doubtful, the stipulation is treated as a covenant rather than a condition subsequent with the right to defeat the conveyance. * * * Here the parties did not see fit to provide that the grantees' failure to perform would cause the property to revert to the grantor, and there is nothing in the deed to indicate that they intended to create a conditional estate. Although petitioners argue to the contrary, the grantor's reservation of a life estate does not suggest that the estate granted would be forfeited if the other stipulations of the instrument were breached. We agree with the Court of Civil Appeals, therefore, that the provisions obligating respondents to maintain the property, pay the taxes and insurance, and furnish food and clothing to the grantor were covenants and not conditions. The remedy for their breach is an action for damages, and petitioners were not entitled to recover the estate conveyed to respondents by the deed."

Similar cases are Meyer v. Swift, 73 Tex. 367, 11 S.W. 378 (Sup.Ct.1889); Kozelski et al. v. Bronder, Tex.Civ.App., 1947, 297 S.W. 664, error dismissed; Neyland v. Black et ux, Tex.Civ.App., 1922, 238 S.W. 304, n. w. h.; and Rosek v. Kotzur, Tex. Civ.App., 1925, 267 S.W. 759, n. w. h.

The same result was reached in Foster v. L. M. S. Development Co., Tex.Civ.App., 1961, 346 S.W.2d 387. That case involved a long-term grant lease which obligated the lessee to either spend a certain amount on improvements or to raze the existing structure and erect a new building in lieu thereof. The lessors sought cancellation of the lease because of the breach by the lessee of those covenants. The Court of Civil Appeals held that the lessors were not entitled to cancellation, stating:

"Implied conditions are not favored in law or in equity. The promise of an obligee will be construed as a covenant unless an intention to create a conditional estate is clearly and unequivocally revealed by the language of the instrument. * * * It has long been the rule that the remedy for breach of covenant is damages, not cancellation."

For these reasons we reverse and render the judgment of the trial court cancelling the assignment of production payment to Valor Oil Company and the deed of trust lien in favor of Republic National Bank of Dallas and hold that such production payment was a conveyance to Robertson and the deed of trust lien held by Republic National Bank is a valid and outstanding obligation.

Reversed and rendered.